**WOMEN IN CITY GOVERNMENT UNITED et al., Plaintiffs,**

v.

**The CITY OF NEW YORK et al., Defendants.**

No. 75 Civ. 2868.

United States District Court, S. D. New York.

April 24, 1981.

Christine Beck, Glastonbury, Conn., Henry L. King, Jamie Stern, New York City, Lawyers' Committee for Civil Rights Under Law by Richard Seymour, Washington, D.C., for plaintiffs.

Allen G. Schwartz, Corp. Counsel by Doron Gopstein, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

Plaintiffs filed this action more than five years ago alleging that the use by defendants of sex-differentiated actuarial tables in their retirement plans violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the New York Human Rights Law, N.Y.Exec.Law § 290 et seq. (McKinney). Since that time the parties have engaged in discovery and extensive, though unsuccessful settlement negotiations. Now, both sides have moved for summary judgment on the issue of defendants' liability under Title VII. The parties also seek a determination of the nature and scope of relief, if any, to which plaintiffs are entitled pursuant to that Act. For the reasons that follow, the Court grants plaintiffs' motion for summary judgment on the merits of their Title VII claims. On the

question of damages, the Court finds that there are triable issues of fact in dispute, and therefore denies summary judgment for either side.

## STATEMENT OF FACTS

The plaintiff class in this action consists of past and present female City-Service employees within the meaning of the Administrative Code of the City of New York, section B3–1.0(3), who are compulsory members of a New York City Employees' Retirement System ("NYCERS") Plan.[1] Named plaintiffs are: (1) Women in City Government United ("WICGU"), an unincorporated organization of female employees of defendant City of New York; and (2) five female individuals, each of whom is a member of a NYCERS Plan. Defendants include the City of New York ("City"); the NYCERS, which administers City retirement plans pursuant to Chapter III, Title B of the Administrative Code of the City; members of the NYCERS Board of Trustees; and the Mayor of the City.

The facts material to the contested legal claims under Title VII essentially are admitted by all the parties.[2] NYCERS offers a number of plans for retirement benefits[3] to City-Service employees, who are required by Administrative Code § B3–3.0(1) to join one of those Plans.[4] As of January 31, 1980, there were approximately 160,000 active members of NYCERS of whom 50,000 were female. Retirees receiving NYCERS benefits numbered approximately 70,000, 20,000 of whom were female.[5]

Under the plans, contributions are a percentage of employees' salaries during their working careers, set at minimum rates derived from actuarial tables.[6] Employee contributions, and thus the retirement allowance, are also affected by certain provisions of the Social Security Law and the ITHP.[7] Employers contribute to the ITHP and pension reserves, which constitute part of the total retirement allowance. *See* note 3, *supra.*

NYCERS Plans fall into two general categories according to the benefits available: guaranteed and non-guaranteed. The dif-

---

1. Per stipulation of November 3, 1976, the class was certified under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. Past employees include retirees who are currently receiving benefits as well as those who have resigned but retain vested pension rights under Administrative Code § B3–42.1. The class excludes present female employees who are members of a Coordinated Escalator Retirement Plan, since that plan provides for equal contributions and benefits as between men and women.

2. The few disputes arising from the parties' papers concern the legal import of the admitted facts. *See, e. g.,* Plaintiffs' Reply Memorandum of Law at 2–4. Plaintiffs accept Defendants' Answers to Plaintiffs' Second Set of Requests for Admissions, which address the salient issues in the case, as an agreed statement of facts. *See* Plaintiffs' Memorandum of Law at 2, 37–38.

3. Retirement benefits consist of an annual allowance payable in monthly installments. The allowance is made up of one to three parts: a pension, an annuity, and an Increased Take Home Pay ("ITHP") reserve. Employee contributions fund the annuity accounts while the City contributes to the ITHP and pension reserve portions. *See* Plaintiffs' Memorandum of Law at 7–9; First Affidavit of Schwartz at 5.

4. Specifically, any City-Service employee in the competitive or labor classes who has 6 months' employment with the City and earns at least $840.00 per year must be a member of a NYCERS Plan. *See* Second Affidavit of Schwartz, Ex. "C" at 1.

5. Defendants' Answer to Plaintiffs' Second Set of Requests for Admissions at 3. Slightly different figures appear in Defendants' Statement Pursuant to Rule 9(g) at 1. However, the base year for the latter figures is June 30, 1979, which may explain the discrepancy. Even if not, the difference has no impact on the Court's ruling.

6. The contribution rates are based on the age and sex of the employee at the time the plan is joined. Separate actuarial tables exist for males and females. Tables for males are based on actual experience whereas the tables for females assume women will live three years longer than men. Thus, contribution rates are always higher for females than for similarly situated males.

7. These provisions are discussed *infra,* note 20, in detail.

ference between the two is the manner of calculating the retirement allowance (benefit). Under guaranteed plans, the overall retirement allowance is a guaranteed percentage of the last year's salary.[8] Under the non-guaranteed plans, only the pension portion of the retirement allowance is a guaranteed percentage of the last year's salary. The annuity and ITHP parts of the allowance are determined by the amount of money actually contributed to those funds, divided by an annuity factor.

Annuity factors, like the contribution rates, are derived from trustee-approved, sex-differentiated actuarial tables. Under guaranteed plans, annuity factors are applied to the annuity and ITHP reserves to determine two parts of the monthly allowance with the result that those portions of the retirement allowance are always different for men and women. The pension reserve portion is the remainder after the annuity and ITHP funds are subtracted from the guaranteed allowance. Thus, all three elements of guaranteed plans are different for similarly situated males and females. Most important, the *overall* retirement allowance for a similarly situated male and female under the guaranteed plans is different in every case except where each retires with exactly 25 years of service, having contributed no more or no less than the baseline rate.[9]

Under non-guaranteed plans the pension element is calculated as a guaranteed percentage of the last year's salary so it results in equality between similarly situated members of the two sexes. However, because the other two elements are calculated using the sex-differentiated annuity factor, they are not the same for men and women. Ac-

cordingly, the total allowance under the non-guaranteed plans is not the same between similarly situated males and females.[10]

From the foregoing statement of facts it is apparent that the NYCERS Plans challenged in this lawsuit utilize sex-differentiated actuarial tables to compute both the contributions and the benefits for employee members. Those tables assume that women as a class will live longer than men. As a result, women contributors pay more than similarly situated men, *i. e.*, women contributors take home less pay than similarly situated men. In addition, the monthly benefits after retirement or death for similarly situated men and women, in general, are not equal.

## DISCUSSION OF LAW

The parties to this action raise a number of issues and arguments falling into two categories: liability and damages. The issues pertaining to liability are legal in nature, and, as discussed below, are resolved by the Court in favor of plaintiffs. With regard to the appropriate relief, the Court finds that a number of serious and vigorously disputed factual issues remain. Those issues cannot be resolved on a motion for summary judgment but must be decided by the trier of fact or by settlement.

### (1)

### LIABILITY

Plaintiffs have demonstrated their right to relief under Title VII. First, all jurisdictional prerequisites have been satisfied as to each of the defendants. Second, the undisputed facts evidence a *prima facie* vio-

---

8. Benefits increase if the employee works for more than 25 years, based on actual employee contributions during the additional years.

9. As discussed *infra*, note 20, it is possible for an employee to reduce his or her contributions by the amount paid to Social Security. Also, an employee is free to place more than the baseline monthly percentage in his or her retirement fund. A thirty-year-old woman joining the Career Pension Plan in June 1973 would contribute, normally, 6.50% of her pay

to the Plan. A similarly situated male would contribute 6.05% of his paycheck.

10. The nature of the difference varies according to the payment method selected. Under the maximum retirement allowance, females receive smaller allowances than similarly situated males unless each retires after exactly 25 years having contributed no more and no less than the normally required rate. *See* note 9, *supra*. With other options, the allowance for females is greater than that for males.

lation of Title VII.[11] Third, defendants have not proven that they are exempted from the reach of Title VII.

A. *Jurisdiction*

The parties agree that plaintiffs have met the jurisdictional prerequisites of initiating a federal action under Title VII with respect to defendants NYCERS and the City.[12] However, defendants argue that those requirements have not been satisfied as to the individually-named trustees of the NYCERS because the latter were not named in the complaints filed with the Equal Employment Opportunity Commission. In addition, the trustees maintain that, at most, they are amenable to suit in their official capacities so that the claims against them in their individual capacities must be dismissed.

■ The Court holds that the trustees are proper defendants under Title VII, following the reasoning of *Vulcan Society v. Fire Department of City of White Plains*, 82 F.R.D. 379, 389 (S.D.N.Y.1979). There, the Court held:

> [I]t is not necessary that each and every defendant be named in the EEOC charge for that defendant to be a proper Title VII defendant in an action. [citation] If ... there was 'substantial identity' between those named in the EEOC charge and these defendants [citation] and these defendants had notice of the EEOC proceeding [citation] these defendants need not have been named in the EEOC charge to be properly before this court.

*See Glus v. G. C. Murphy*, 562 F.2d 880, 888 (3d Cir. 1977); *Vanguard Justice Soc'y, Inc. v. Hughes*, 471 F.Supp. 670, 688–89 (D.Md.

1979). *Cf. Schick v. Bronstein*, 447 F.Supp. 333, 336 (S.D.N.Y.1978); *Stith v. Manor Baking Co.*, 418 F.Supp. 150, 156 (W.D.Mo. 1976). The policies underlying the administrative scheme for Title VII have been fulfilled in this case, since notice to NYCERS in practice is notice to its Board of Trustees[13] and the likelihood of an informal, administrative solution to the present dispute is negligible. Defendants do not refute plaintiffs' claim that NYCERS has no separate officers from its trustees, or that the trustees make all decisions for NYCERS.[14] Nor do defendant trustees point to any decision in this Circuit that would compel dismissal for lack of jurisdiction over the claims against them.

■ The trustees further argue that plaintiffs have no "right to proceed against them in their *individual* capacities."[15] The Court agrees. Those defendants, as individuals, are not employers (or agents thereof) within purview of Title VII, 42 U.S.C. § 2000e(b). They were working on behalf of NYCERS solely as trustees and at all times within the scope of their authority when they approved the use of sex-differentiated actuarial tables for the NYCERS Plans. Those acts should not be considered now as the basis for individual liability. *See Friend v. Union Dime Savings Bank*, 24 Emp.Prac.Dec. ¶ 31,209 at 17,369 (S.D.N.Y. 1980). *Cf. Kedra v. City of Philadelphia*, 454 F.Supp. 652, 665–66 (E.D.Pa.1978) (defendants held amenable to suit under 42 U.S.C. § 1983 as individuals "insofar as they did not act in an official capacity").

B. *Sex Discrimination*

The leading case involving sex-differentiated actuarial assumptions and employer-

11. The Court does not address plaintiffs' claims under 42 U.S.C. § 1983, the Constitution; or New York law inasmuch as they were not argued or briefed by the parties.

12. Those prerequisites, set out in 42 U.S.C. § 2000e–5, include the filing of a complaint with the Commission on Human Rights of the City and the Equal Employment Opportunity Commission. Plaintiff WICGU and individual plaintiff Zises received notice of their right to sue on March 21, 1975. This action was filed within 90 days of receipt of said notice as required by the statute.

13. Likewise, any conciliation efforts among the agencies involved and NYCERS must have been coordinated through the trustees.

14. Plaintiffs' Reply Memorandum of Law at 33. Thus, the interests of the named and unnamed parties in the administrative complaints are virtually identical.

15. Defendants' Reply Memorandum of Law at 14.

provided retirement benefits is *Los Angeles Department of Water & Power v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). In *Manhart*, a class of female city employees brought an action under Title VII to invalidate the defendant's retirement programs because they required greater monthly contributions from women for equal benefits. The discrepancy in contributions (take-home pay) was founded upon the actuarial assumption that women as a class live longer than men.

While conceding that the employer's generalization—that women live longer as a class—was true, the Court still struck down the mandatory retirement/pension plan under Title VII. It found that pension benefits and employer-employee contributions to retirement plans are compensation under Title VII,[16] that the group insurance program adopted by the petitioner was a form of illegal discrimination on the basis of sex,[17] and that no business necessity for the illegal program had been demonstrated.[18]

The key predicates of the Title VII violation found in *Manhart* are present in the instant case. The employer in *Manhart* "administered retirement, disability, and death-benefit programs," the benefits from which were "funded entirely by contributions from the employees and the Department, augmented by the income earned on those contributions." *Id.* at 704–705, 98 S.Ct. at 1373. NYCERS[19] is a compulsory membership retirement system[20] whose benefits, according to its manual, "are financed by employer and employee contributions and from earnings on the invested funds of the System."[21] In *Manhart*, the employer determined that its female employees would live a few years longer on the average than males, and increased their contribution rate accordingly. NYCERS has calculated contribution and annuity rates based on actuarial tables that assume women live longer as a class than men by three years.

■ The Court therefore finds that the Plans challenged in this case violate Title VII to the extent that they require sex-differentiated contributions based on class assumptions about the longevity of females (or males).

■ Plaintiffs also contend that the use of sex-differentiated actuarial tables in the computation of retirement benefits violates Title VII. That issue was not before the Court in *Manhart*, but its reasoning is equally applicable to the present situation. The Court stated:

16. 435 U.S. at 712 n.23, 98 S.Ct. at 1377 n.23.

17. *Id.* at 711, 98 S.Ct. at 1377.

18. *Id.* at 716 n.30, 98 S.Ct. at 1379 n.30.

19. For the purpose of this discussion, the Court refers to the City and NYCERS jointly as "NYCERS" because both defendants are properly considered employers subject to Title VII. That proposition is not disputed by the parties and is supported by *Spirt v. Teachers Ins. & Annuity Ass'n*, 475 F.Supp. 1298, 1308 (S.D.N.Y.1979) and *Peters v. Wayne State University*, 476 F.Supp. 1343, 1351 (E.D.Mich.1979). *Cf. Equal Employment Opportunity Commission v. Colby College*, 589 F.2d 1139, 1141 (1st Cir. 1978).

20. The Court rejects the distinction defendants attempt to draw between this case and *Manhart* as to the voluntariness of participation in the Plans. Under Section 138–b of the New York State Retirement and Social Security Law, NYCERS members may reduce their contributions up to the rate paid for Social Security out of their earnings. Defendants emphasize that "any member ... in a career pension plan position whose salary does not exceed the current Social Security base ... and whose assigned rate of contribution is no greater than 8.13% [Social Security deduction plus ITHP contribution assumed by employer] has the right to make no contribution to the system." Defendants' Memorandum of Law at 6. However, it is wrong to conclude that participation in the Plans is voluntary. The availability of an option to some members with a particular salary level and an 8.13% maximum contribution rate does not make the system noncompulsory or alleviate the illegal aspects of the system for plaintiffs and the class they represent. And, one court has held that a *voluntary* state-operated retirement system is subject to the holding in *Manhart*. *See Norris v. Arizona Gov. Comm.*, 486 F.Supp. 645 (D.Ariz.1980).

21. *See* Second Affidavit of Schwartz at 2. In both cases employee contributions are deducted from take-home pay.

Individual risks, like individual performance, may not be predicted by resort to classifications proscribed by Title VII. 435 U.S. at 710, 98 S.Ct. at 1376. *Manhart* teaches that Title VII is addressed to individual concerns and that the Act declares illegal "[e]ven a true [class] generalization" if it discriminates against an individual "to whom the generalization does not apply." *Id.* at 708, 98 S.Ct. at 1375. *See Norris v. Arizona Governing Committee,* 486 F.Supp. 645 (D.Ariz.1980). That lesson is not reflected in defendants' methods for calculating annuity rates or retirement benefits in this case. As a result, the NYCERS Plans violate Title VII with respect to benefits as well as contributions.

Several other federal courts that have addressed the "benefits" issue have arrived at the same conclusion. In *Equal Employment Opportunity Commission v. Colby College,* 589 F.2d 1139 (1st Cir. 1978), the EEOC brought suit against Colby College, which provided a mandatory pension plan for employees through the Teachers' Insurance & Annuity Association ("TIAA"), because the monthly annuity payments for women were smaller than those for their male counterparts. The defendant attempted to distinguish *Manhart* on its facts. The Court responded:

> [I]t is difficult to perceive a distinction that would permit a plan whereby women make contributions equal to those of men, but receive smaller monthly payments.... [L]ike the Department in *Manhart,* [defendants] have presented no evidence that any factor other than sex was considered in arriving at the benefit differential. (footnote omitted)

*Id.* at 1144.

That same result was reached in *Spirt v. Teachers Insurance & Annuity Association,*

475 F.Supp. 1298 (S.D.N.Y.1979). There the Court held that the abstract distinction between contributions and benefits was without significance, stating:

> As in *Manhart,* the record contains no evidence that any factor other than the employee's sex was taken into account in calculating the differentials in benefits received by men and women.

*Id.* at 1309.[22] The same is true in the present case. Therefore, unless the challenged practices here are exempted from Title VII, they constitute unlawful discrimination.[23]

### C. *Exemption*

Defendants rely on two theories to counter plaintiffs' showing that the NYCERS Plans' sex-based differences in contributions and benefits for individual employees violate Title VII. First, they argue that "NYCERS is a fair and balanced" system, with a number of options available to employees which, taken as a whole, do not prefer one sex over the other.[24]

■ That argument cannot be reconciled with the holdings in *Manhart* and its progeny that Title VII applies to individuals, not to women as a class.[25] As stated in *Manhart,* the relevant issue is whether there is "evidence that any factor other than the employee's sex was taken into account in calculating the differential between the respective contributions by men and women." 435 U.S. at 712, 98 S.Ct. at 1377. *See E.E.O.C. v. Colby College,* 589 F.2d at 1144; *Spirt v. TIAA,* 475 F.Supp. at 1308. The fact that in some instances women may derive greater benefits, or that there are options available that allow rates for some

---

**22.** *Accord, Norris v. Arizona Gov. Comm.,* 486 F.Supp. 645 (D.Ariz.1980); *Peters v. Wayne State University,* 476 F.Supp. 1343 (E.D.Mich. 1979). *Cf. Sobel v. Yeshiva Univ.,* 477 F.Supp. 1161, 1166 (S.D.N.Y.1979).

**23.** *Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. at 711, 98 S.Ct. at 1377.

**24.** Defendants' Reply Memorandum of Law at 4.

**25.** It also attempts to carve out an exception to Title VII, unsupported in the case law, that was specifically rejected in *Norris v. Arizona Gov. Comm.,* 486 F.Supp. 645 (D.Ariz.1980). *Cf. Reilly v. Robertson,* 266 Ind. 29, 360 N.E.2d 171 (Ind.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 73, 54 L.Ed.2d 83 (1977) (state retirement system struck down under the Equal Protection Clause of the federal Constitution).

to be reduced,[26] does not constitute a defense to a *prima facie* violation of Title VII.

Defendants' second argument is that application of Title VII to NYCERS is barred by the McCarran-Ferguson Act. Defendants' Memorandum of Law at 13. That Act provides, in part:

> (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
>
> (b) No Act of Congress shall be construed to invalidate, impair, or supercede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That ... the Sherman Act, ... the Clayton Act, and ... the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C. § 1012. The Act was passed in 1945 in reaction to the Supreme Court decision in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which held "that insurance transactions were subject to federal regulation under the Commerce Clause, and that the antitrust laws ... were applicable to them." *S.E.C. v. National Securities, Inc.*, 393 U.S. 453, 458, 89 S.Ct. 564, 567, 21 L.Ed.2d 668 (1969).[27]

The House Committee Report on the bill endorsed by the whole Congress states, in pertinent part:

> Inevitable uncertainties which followed the handing down of the decision in the Southeastern Underwriters Association case, with respect to the constitutionality of State laws, have raised questions in the minds of insurance executives, State insurance officials and others as to the validity of State tax laws as well as State regulatory provisions ....
>
> \* \* \* \* \* \*
>
> The purpose of the bill is twofold: (1) To declare that the continued regulation and taxation by the several States of the business of insurance is in the public interest; and (2) to assure a more adequate regulation of this business in the States by suspending the application of the Sherman and Clayton Acts ....
>
> \* \* \* \* \* \*
>
> It is not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the Southeastern Underwriters Association case.

H.R.Rep.No.143, 79th Cong., 1st Sess. (1945), *reprinted in* [1945] *U.S.Code Cong. Service*, 670, 671, 672.

Soon after passage of the bill, the Supreme Court considered the reach of the statute in *Prudential Insurance Co. v. Benjamin*, 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1945). It explained that Congress' intent was to protect state legislation regulating the insurance industry from attack

---

**26.** Defendants argue at length that members may reduce and in some cases eliminate their contributions to the system and therefore that the Plans do not come within the holding in *Manhart*. That argument cannot withstand close scrutiny. Even if it is true that "98% of plaintiffs' active members are *not required* to contribute anything" due to Social Security and ITHP reductions in employee contributions, and that the difference in contribution rates between men and women "would have amounted in prior years to an average of $6.38 per plaintiff per year ...," Defendants' Reply Memorandum of Law at 4–5, the Plans do not comply with Title VII. Nothing in the language

of *Manhart* suggests that any particular percentage point differential is required either to establish plaintiffs' standing or to demonstrate illegal sex discrimination.

**27.** Prior to the *South-Eastern Underwriters Association* decision, Congress and the courts had assumed that the insurance business did not constitute interstate commerce and therefore that state taxation (regulation) of insurance companies doing business within that state's boundaries did not burden interstate commerce. *Paul v. Virginia*, 8 Wall. 168, 183, 19 L.Ed. 357 (1869).

under the Commerce Clause. Congress especially sought, in the absence of clear federal legislation, to prevent federal courts from nullifying state regulation of the insurance business under the doctrine of implied federal preemption. *Id.* at 430–31, 66 S.Ct. at 1155. Later, in *S.E.C. v. National Securities, Inc.*, the Court observed: "Congress was mainly concerned with the relationship between insurance ratemaking and the antitrust laws, and with the power of the States to tax insurance companies." 393 U.S. at 458–59, 89 S.Ct. at 567–68, *citing* 91 Cong.Rec. 1087–88 (remarks of Representatives Hancock and Celler).

■ Based on the historical derivation, the legislative reports, and subsequent judicial interpretation of the Act, it is the opinion of this Court that Congress did not intend the McCarran-Ferguson Act as a limitation on its power to enact civil rights legislation that might incidentally affect the business of insurance.[28] *See S.E.C. v. National Securities, Inc.*, 393 U.S. at 458–59, 89 S.Ct. at 567–68; *Contra, Spirt v. Teacher Ins. & Annuity Ass'n*, 475 F.Supp. 1298, 1304 (S.D.N.Y.1979).

■ First, it is clear from the legislative history[29] and from the language of the statute that Congress' primary concern focused on the disruptive effects of federal trade regulation and antitrust legislation unexpectedly made applicable to the insurance industry by the *South-Eastern Underwriters* case. *Cf. Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 218 n.18, 99 S.Ct. 1067, 1076 n.18, 59 L.Ed.2d 261 (1979) ("There is no question that the *primary* purpose of the McCarran-Ferguson Act was to preserve state regulation of the activities of insurance companies, as it existed before the *South-Eastern Underwriters* case.... The McCarran-Ferguson Act operates to assure that the States are free to regulate and tax insurance companies without fear of Commerce Clause attack."). By extension, the Act should not be applied indiscriminately to subsequent federal legislation, the overriding purpose of which is not the regulation of commerce but the protection of other important federal interests, solely because that legislation fails specifically to state that it is applicable in circumstances where insurance interests are implicated.[30]

**28.** On this point a student commentator recently proposed that Congress did not intend that Title VII be limited by the provisions of the McCarran-Ferguson Act. Comment, "Title VII and the McCarran Act: Sex Discrimination in Retirement Benefits by Third-party Insurers," 68 *Geo.L.J.* 1285 (1980). He observed:

[C]ongress intended that the effect of title VII be felt by all employers in all industries throughout the nation. Indeed, Congress provided that the subchapter override conflicting state legislation. This preemption prevents local efforts to circumvent title VII and strongly suggests that Congress did not intend to allow a particular industry to escape the provisions of title VII. Therefore, because title VII's prohibition against discrimination in employment is irreconcilable with the McCarran Act's shield for state laws permitting discrimination in retirement benefits provided through an insurance company, title VII eliminates that shield.

*Id.* at 1295.

**29.** Throughout the congressional debates on the Act, the primary reference is to the need to grant a moratorium to the states on the application of three *specific* statutes: the Sherman Act, 15 U.S.C. §§ 1 *et seq.*, the Clayton Act, 15 U.S.C. §§ 12 *et seq.*, and the Federal Trade

Commission Act, 15 U.S.C. §§ 41 *et seq.* *See* 91 Cong.Rec. 504 (remarks of Senators Ferguson and O'Mahoney); *id.* at 506–7 (remarks of Representative Revercomb); *id.* at 1115 (remarks of Representative Hancock) ("The *[Southeastern]* decision makes insurance interstate commerce and therefore subject to all the statutes we have enacted dealing with interstate commerce. There are four, I believe: The Federal Trade Commission Act, the Patman Antidiscrimination Act, the Clayton Act, and the Sherman Act."

**30.** *Cf. Ben v. General Motors Acceptance Corp.*, 374 F.Supp. 1199, 1203 (D.Colo.1974) ("There is no indication in the background and history of the McCarran Act or its application that the McCarran Act was intended to deprive a citizen of access to the Federal Courts to obtain redress for violations of his civil rights" under the Civil Rights Act, 42 U.S.C. §§ 1982, 1985.). This view is strengthened in the context of Title VII due to the section of the Act preempting all state law in conflict with its anti-discrimination provisions. 42 U.S.C. § 2000e–7.

■ This conclusion finds support in the Second Circuit decision in *Hamilton Life Insurance Co. v. Republic National Life Insurance Co.*, 408 F.2d 606 (2d Cir. 1969).[31] In dicta, the Court stated, at 611:

The McCarran Act does not recreate a 'broad field for state regulation of the insurance industry free from federal intervention,' . . . Instead it was a reaction to *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 [64 S.Ct. 1162, 88 L.Ed. 1440] . . . .

\* \* \* \* \* \*

The McCarran Act does not . . . exempt the business of insurance from the coverage of all federal statutes which do not specifically state that their provisions are applicable to insurance.

Thus, the fact that Congress did not expressly make Title VII applicable to the insurance industry should not automatically shield that industry from the Act's prohibitions against racial, religious, alienage or sexual discrimination.

Second, at the same time the Supreme Court handed down the *South-Eastern Underwriters* case applying federal antitrust statutes to the insurance industry, it ruled in *Polish Alliance of the United States v. National Labor Relations Board*, 322 U.S. 643, 649–51, 64 S.Ct. 1196, 1199–1200, 88 L.Ed. 1509 (1944) that the National Labor Relations Act applied to the business of insurance. In contrast to the immediate, adverse reaction to the *South-Eastern Underwriters* decision, Congress did not object to the ruling in the *Polish Alliance* case that the industry was subject to federal labor regulation. In fact, Congress expressly exempted[32] the National Labor Relations Act

and the Fair Labor Standards Act from the terms of the McCarran-Ferguson Act. 15 U.S.C. § 1014. Thus, at the time when the legislature set up the McCarran-Ferguson protection of state insurance regulation, it clearly distinguished between federal legislation in the fields of labor and trade regulation with respect to insurance interests.

A third source of support for the conclusion that Congress did not intend to exempt the insurance industry from Title VII is found in the enactment of the Employer Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* ERISA was adopted:

to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring disclosure and reporting to participants and beneficiaries of financial and other information . . ., by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b).

■ The legislative debates surrounding the enactment of ERISA make it clear that the federal policy against employment discrimination, embodied in Title VII, was intended to extend to employee retirement, pension, death and other benefit plans, and that Title VII was incorporated by reference into ERISA.[33] *See Pervel Industries v. State of Conn. Comm'n of Human Rights and Opportunities*, 468 F.Supp. 490 (D.Conn. 1978); 120 Cong.Rec. 4726 (remarks of Representatives Abzug and Dent); 119 Cong. Rec. 30409–10 (remarks of Senators Mon-

---

31. Defendants in *Hamilton* argued that the McCarran-Ferguson Act barred application of the federal Arbitration Act, 9 U.S.C. § 4, to a controversy surrounding an agreement of reinsurance by Republic for group life insurance policies written by Hamilton covering New York City civil service employees. The Court held that the state arbitration statutes were not enacted for the purpose of regulating the business of insurance and therefore that the McCarran-Ferguson Act did not preclude the application of federal arbitration statutes to insurers.

32. *See* Cong.Rec. 501 (remarks of Senator O'Mahoney); *id.* at 1118 (remarks of Representative Gwynne); *id.* at 1472 (remarks of Senator O'Mahoney).

33. Section 1002(1), (2) and (3) define employee benefit plans as either an employee welfare benefit plan, maintained through insurance or otherwise, to provide death, disability, medical, etc. benefits, or an employee pension plan to provide retirement income.

dale and Williams). During those debates, antidiscrimination amendments to the proposed bill, originally offered in both houses, were withdrawn only after it was suggested and accepted that Title VII already applied to the entire field of employee benefit plans.[34] From the debates and the final language of the statute, it is apparent that Congress' concern that discrimination in employee benefits be prohibited outweighed the interest it had in the insurance industry and in the preservation of state insurance regulation.[35] The Act also provides evidence that Congress' intent in enacting Title VII—although not expressly stated—was that it apply to *all* employment opportunities, including employee benefits provided through NYCERS.

Fourth, it is particularly relevant that the Equal Employment Opportunity Commission ("EEOC")—the agency established by Congress to enforce Title VII—has been active in negotiation and litigation to terminate the use of sexually discriminatory mortality tables in employee benefit plans.[36] *See* cases cited in the *Pension Reporter*, Bureau of National Affairs, No. 273, p. A–10 (January 14, 1980). Recently, the EEOC approved a unisex mortality table to be used by the Teachers' Insurance and Annuity Association and College Retirement Equities Fund which takes age but not sex into account in determining premiums and benefits.[37] The EEOC's stated reason for participating in the development of the new table was its view that the

34. Mr. Mondale:
Mr. President, for some months I have been deeply concerned with the need to insure that pension benefits are made available on a nondiscriminatory basis to all those who have earned them regardless of race, color, national origin, religion, or sex. . . .

\* \* \* \* \* \*

Mr. Williams:
[I] fully share your concern for full enforcement of nondiscrimination requirements affecting pension and profit-sharing plans . . . . And I believe this can be done by the Equal Employment Opportunity Commission under terms of existing law.

Mr. Mondale:
Does the Senator agree that discrimination based on race, color, national origin, religion or sex affecting participation in pension or profit-sharing plans, is presently prohibited under section 703(a) of the Equal Employment Opportunity Act? . . .

Mr. Williams:
I agree with the Senator's reading of the statute and I understand that the courts are following this view. . . . [T]he EEOC must view discrimination in pension plans as among the most serious forms of employment discrimination. . . .

35. ERISA preempts all state laws "insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(a). However, state insurance laws are saved from preemption under section 1144(b)(2)(A) of the Act. That section provides:
Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking or securities.

The savings clause makes clear that state regulation of insurance was not intended to be disrupted by ERISA. However, that clause was significantly limited in subparagraph (B), which states:
Neither an employee benefit plan . . . nor any trust established under such a plan, shall be deemed to be an insurance company . . . or to be engaged in the business of insurance or banking for the purposes of any law of any State purporting to regulate insurance companies, [or] insurance contracts . . . .
The "deeming" clause evidences congressional disapproval of an employer (such as the City in the present case) maintaining a benefit program which he funds through a third-party insurer and thereafter seeking to invoke state insurance laws to shield him from federal regulation. *See Hewlett-Packard Co. v. Barnes*, 425 F.Supp. 1294, 1300 (N.D.Calif.1977), *aff'd*, 571 F.2d 502 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978). That congressional concern would be greatly frustrated were the Court in the matter at bar to apply the McCarran-Ferguson Act so as to exempt defendants from the requirements of Title VII.

36. Although not binding on the Court, the interpretation by the enforcing agency of its substantive mandate under the statute should be accorded substantial weight. *Cf. I.T.T. v. International Brotherhood of Elec. Workers*, 419 U.S. 428, 441, 95 S.Ct. 600, 609, 42 L.Ed.2d 558 (1975).

37. According to the EEOC, at least 30 states' insurance departments have approved the new table. *See Pension Reporter*, Bureau of National Affairs, No. 310, p. A–12 (December 1, 1980).

practice of paying benefits based on sex-distinct mortality tables violates Title VII.[38]

■ The McCarran-Ferguson Act was intended to preserve state regulation of the business of insurance only to the extent that Congress chose not to enter the field. This Court's analysis of Title VII, supplemented by its study of the McCarran-Ferguson Act and ERISA, does not reveal any basis for concluding that Congress intended the Civil Rights Act's prohibition against employment discrimination to be suspended in the area of employee pension, welfare or other benefits provided through an independent insurer. Therefore, it finds that the McCarran-Ferguson Act is inapplicable to the instant action.[39]

### D. *Summary*

The actuarial tables adopted by defendants assume that women as a class live longer than men. Reliance on those tables has resulted in contribution and annuity rates that are different for individual men and women participating in the NYCERS Plans solely because of sex classifications. Those rates are employed to certify take-home pay deductions and monthly benefits to individual workers, both of which, in general, are different as between similarly situated employees of different sex. The

NYCERS Plans therefore are illegal under Title VII and are not exempted or justified by any other law.

### (2)
### DAMAGES

■ Even though there is an established "presumption in favor of retroactive liability" that "can seldom be overcome" once a Title VII violation has been found,[40] the Supreme Court issued a caveat in *Manhart* that "it may be necessary to take special care in fashioning appropriate relief," in cases involving retirement pensions and insurance. 435 U.S. at 718, 98 S.Ct. at 1380. The Court furthermore stated:

> The occurrence of major unforeseen contingencies ... jeopardizes the insurer's solvency and, ultimately, the insureds' benefits. Drastic changes in the legal rules governing pension and insurance funds, like other unforeseen events, can have this effect.

*Id.* at 721, 98 S.Ct. at 1382.

■ On the basis of the present record, this Court is unable to make the careful and considered judgment required by *Manhart* with respect to the award of back pay and other prospective relief requested by plaintiffs. A number of key factual issues are controverted, including the potential fiscal

---

**38.** *Id.* at R–15, Opinion Letter from Issie L. Jenkins, Deputy General Counsel of the EEOC to Francis P. Gunning, Executive Vice President of the Teachers' Insurance and Annuity Association-College Retirement Equities Fund, dated November 20, 1980.

**39.** Even if the McCarran-Ferguson Act were held applicable in actions brought under Title VII, shielding conflicting state insurance laws from the preemption clause of Title VII, 42 U.S.C. § 2000e–7, defendants in this case have failed to demonstrate that a New York State law would be "invalidated, impaired or superceded" if the prohibition of Title VII, as interpreted in *Manhart*, against the use of sex-differentiated actuarial tables to compute employment benefits is enforced. *See Hamilton Life Ins. Co. v. Republic Nat'l Life Ins. Co.*, 408 F.2d at 611 ("To avail itself of the McCarran Act, [defendants] must show that the application of [Title VII] would 'invalidate, impair or supercede' any law enacted by [the] State for the purpose of regulating the business of insurance.") At the request of the Court, the parties

submitted extensive supplemental briefs with respect to the "impairment" issue, from which it is apparent that no *state* law prescribes or endorses actuarial assumptions for NYCERS or mandates that sex-differentiated actuarial tables be utilized. The power to adopt actuarial standards, to set contribution rates, and to calculate annuity factors is left to the discretion of the NYCERS Trustees. Administrative Code, Chapter III, Title B, § B3–11.0. *See also* § 136.6(e) of the regulations adopted pursuant to N.Y.Ins.Law § 36–a (McKinney). Thus, while state law permits the Trustees, on the advice of the Chief Actuary, to adopt actuarial standards, based on the bald assumption that women as a class live three years longer than men, New York's regulatory scheme for the business of insurance will not be impaired if the City and NYCERS are compelled to conform to the requirements of Title VII.

**40.** *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975), *cited* in *Manhart*, 435 U.S. at 719, 98 S.Ct. at 1380.

impact of a damage award on the NYCERS and the City. Those issues cannot be properly resolved on a motion for summary judgment.

## CONCLUSION

Plaintiffs' motion for summary judgment is granted with respect to defendants' liability under Title VII for use of sexually discriminatory methods of calculating employee benefits. Defendants' motion for summary judgment is denied. The Court defers judgment as to the appropriate relief to be awarded to plaintiffs. *See* page 297, *supra.*

It Is So Ordered.