**Mildred PETERS et al., Plaintiffs,**

v.

**WAYNE STATE UNIVERSITY et al., Defendants.**

**Civ. No. 670165.**

United States District Court,
E. D. Michigan, S. D.

Sept. 25, 1979.

---

Susan D. Ross, ACLU Foundation, New York City, for plaintiffs.

Elmer L. Roller, Detroit, Mich., for Wayne State University.

William Glendon, (for TIAA–CREF) Rogers & Wells, New York City, Avern Cohn, Detroit, Mich., (for TIAA–CREF) for defendants.

## OPINION

DeMASCIO, District Judge.

The plaintiffs, 78 past and present female Wayne State University employees, have alleged in their amended complaint that use of separate mortality tables for male and female annuitants by co-defendants Wayne State University (WSU), Teachers Insurance and Annuity Association (TIAA) and College Retirement Equities Fund (CREF) violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiffs further allege that defendants conspired to deprive them of "the equal protection of Title VII by jointly agreeing to furnish a retirement program . . . which gives women participants lower monthly benefits

than similarly situated men" in violation of 42 U.S.C. § 1985(3). WSU filed a cross-claim seeking indemnification or contribution from TIAA/CREF for any money judgment plaintiffs may recover from WSU, alleging that TIAA/CREF unilaterally decided to use separate mortality tables for men and women.

In its answer to plaintiffs' amended complaint and the WSU cross-claim, TIAA/CREF denies that its retirement program discriminates against women and asserts that it is standard practice in the insurance industry to use separate mortality tables for men and women and that their use in this case does not violate Title VII because all WSU employees "will for the same money, receive annuities of the same full present value, and each [employee] will have an equal actuarial opportunity ultimately to receive the same total benefits payments."

On April 8, 1977 we certified the case as a class action, and on May 2, 1977, defined the class as:

> All past and present women employees of defendant Wayne State University who have participated or are participating in the TIAA/CREF retirement program provided by defendant Wayne State University to its employees.

This litigation has a long history. On January 9, 1976, while plaintiffs' charges of discrimination were pending before the Equal Employment Opportunity Commission (EEOC), the Board of Governors of WSU filed a complaint in this court for declaratory and injunctive relief, naming as defendants the director and local officers of EEOC, WSU's collective bargaining units and various other federal officials.[1] On January 27, 1976, plaintiffs filed their initial complaint against WSU, alleging that the retirement program WSU purchased from TIAA/CREF pays women participants in the program smaller monthly benefits than similarly situated male employe s in violation of Section 703(a) of Title V I, 42 U.S.C. § 2000e-2(a). On December 14, 1976, we dismissed the action filed by the Board of Governors of WSU, concluding that its complaint failed to allege a case or controversy between WSU and the named defendants. We pointed out that, in any event, "all of the issues raised by WSU [could be] asserted as defenses in the *Peters* action."

The facts relevant to a resolution of plaintiffs' Title VII claim were never really in dispute.[2] The sole issue upon which the parties disagree is whether use by TIAA/CREF of sex-segregated life expectancy tables which results in smaller monthly annuity payments for women than similarly situated men violates Title VII. The circumstances leading to WSU's adoption of the TIAA/CREF retirement plan and the essential details of the retirement program itself are not disputed. Prior to July 1, 1958, before Wayne University became a state supported university, its employees were participants in the Detroit School Employees Retirement System (DSERS), a retirement program administered by the Detroit Board of Education. When WSU became a state sponsored university, it was required by statute to establish its own retirement program to provide benefits

1. *See* Memorandum Opinion, *Board of Governors of Wayne State University v. Perry*, No. 670039 (E.D.Mich., December 14, 1976).

2. Defendants filed a motion for summary judgment but plaintiffs insisted that there were factual issues which had to be tried. To challenge defendants' use of separate mortality tables, plaintiffs promised they would produce statistical evidence to demonstrate that, although women as a group may live longer than men as a group, *working* women do not have greater longevity than *working* men. Plaintiffs did not, however, address this subject. Evidence produced by the defendants demonstrated that plaintiffs' suggestion was unfounded. Plaintiffs further contended that they would establish that most *working* women and *working* men have the same life span. At trial, plaintiffs produced "overlap" graphs which, in our view, are inconclusive. Finally, plaintiffs contended that they would demonstrate that defendants could use other non-discriminatory life expectancy predictors, such as health, weight, smoking, etc., in computing annuity rates. The evidence, however, demonstrated that only the immutable factors of age and sex could be used. *See* Order, September 21, 1977.

equivalent to those provided under the DSERS for those employees who did not wish to remain in the DSERS. Before adopting a retirement program, the Wayne State Faculty Council established a "Retirement Advisory Committee," comprised of 14 faculty and administrative personnel, to conduct a comprehensive study and thereafter to recommend an acceptable retirement program.[3] The Faculty Council's first report recommended that WSU adopt the TIAA/CREF retirement annuity program.[4] Acting upon the Faculty Council's recommendation, the Board of Governors of Wayne State University passed a resolution adopting the TIAA/CREF retirement annuity program, effective July 1, 1958.

TIAA/CREF are corporations which provide insurance and retirement plans for faculty and staff employed by institutions of higher education. The TIAA is a non-profit legal reserve life insurance and annuity company organized under New York law. In 1916, the Carnegie Foundation for the Advancement of Teaching established the Commission on Insurance and Annuities, a highly regarded group of educators, which included representatives of the American Association of University Professors, the Association of American Universities, National Association of State Universities and the Association of American Colleges, to conduct a comprehensive study of the need for pensions for individuals in higher education. They secured technical advice from the Actuarial Society of America and the American Institute of Actuaries. After completing its work, the Commission thoroughly documented the need for a college retirement system and concluded that:

A college retirement system should rest upon the cooperation and mutual contributions of the colleges and the teachers. For the assurance of the annuity, there must be set aside, year by year, enough to build up a reserve adequate to meet the ultimate benefit payments.

The arrangement with the teacher should be put on a contractual basis.

Inasmuch as the annuities were to originate with colleges that were ready to install retirement systems as a matter of institutional policy, the cost of the annuities could and ought to be reduced by eliminating the element of agents' commission from the premium schedule.

The greatest freedom of movement of the college teacher from one college to another should be provided for.

As a result of the Commission's study, the TIAA was incorporated ". . . as an educational service organization, [to provide] insurance annuities especially designed for employees of educational institutions in the United States and Canada." For many years, TIAA operated as if it were a subsidiary of the Carnegie Foundation "with its stock held and voted by the Carnegie Corporation as a trust for the college world. . . ." The annuity and insurance programs offered by TIAA were designed to fulfill the recommendations made by the Commission. Each annuitant had the security of an individual contract with TIAA which immediately vested and was fully funded. CREF, also a non-profit corporation, was created in 1952 by a special act of the New York legislature as a companion organization of TIAA to permit diversification of investments into common stocks. TIAA now has annuity contracts with 550,000 employees in approximately 3100 educational institutions. Approximately 65,000 retired teachers and staff are currently receiving pensions.

The WSU–TIAA/CREF "defined contribution" retirement plan is funded by both employer and employee contributions. WSU deducts 5% from the salaries of each

---

3. *The Faculty Council appointed one of the named plaintiffs in this action and five WSU union representatives on the fourteen member Retirement Advisory Committee.*

4. The Wayne State Faculty Council considered five possible options: (a) continue with the DSERS; (b) join the Michigan Public School *Employees Retirement Fund; (c) administer its own fund; (d) purchase a commercial life insurance plan; or (e) adopt the TIAA/CREF plan. The final report was comprehensive and included tables which illustrated the benefits available under the TIAA plan.*

employee and contributes 10% of each employee's salary, regardless of sex. Any full-time WSU employee 30 years of age with at least two years of service is eligible to contract with TIAA/CREF for an annuity contract. There are some employees, however, who can enter the program at the time of hire, as a special condition of their employment agreement.[5] Employee participation in the TIAA/CREF retirement program is voluntary. Each month WSU forwards to TIAA/CREF the contributions made by its employees together with its matching contribution. The contributions are then allocated and credited to individual accounts for each employee with whom TIAA has a contract. The contracts, therefore, are fully vested so that each employee owns the rights to benefits accumulated during employment. The TIAA/CREF contract is fully "portable," so that the employee may take his/her contract to another institution if he/she leaves WSU. If the employee dies before retirement, his/her funds are available as a death benefit. If an annuity option is selected at death, or if the annuitant reaches retirement age, the available annuity options differentiate on the basis of sex in the amount of periodic benefits received by similarly situated men and women.

In addition to relying on standard mortality tables developed by the Society of Actuaries, TIAA/CREF's own actuaries study annually the mortality experience of their own annuitants by comparing the number of annuitants alive at the start of each year with the number who have died during the year for each age and for men and women separately. These studies demonstrate a significantly higher mortality rate for men than for women.[6] For example, studies involving TIAA annuitants from 1950–1975 disclosed that for every 100 female deaths there were 187 male deaths. TIAA's own mortality tables further show that, at every age, the male mortality rate is greater than the female mortality rate. The data reflect that, at age 65, the difference of life expectancy varies approximately four years. Thus, the mortality tables used by TIAA/CREF accurately reflect the actual experience of their own annuitants.

Although the plaintiffs have not disputed that the TIAA/CREF retirement plan operates on an actuarily sound basis, they nonetheless contend that paying retired women less monthly benefits than identically situated men discriminates against women in violation of Title VII.[7] The plaintiffs argue that *City of Los Angeles, Department of Water and Power v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), invalidated all sex-based differentials in employee group retirement plans, whether the plan is a defined benefit plan, as in *Manhart*, or a defined contribution plan, as in this case. Plaintiffs reason that in a retirement plan either the contributors are equal and the benefits varied or the benefits are equal and contributions varied to account for the lower female mortality rate. In either case, plaintiffs argue the greater longevity of women as a group is accounted for in one variable or the other and, therefore, the Court in *Manhart* did not intend to limit its holding to variables on the contribution end of a retirement plan.

5. The terms of a retirement plan are a mandatory subject of collective bargaining under Michigan law. The collective bargaining agreements between WSU and its various employee unions define eligible groups of employees and set the amounts which the University must contribute on behalf of employees who select the TIAA/CREF plan. *See* WSU Exh. 118 at 22.

6. In view of the large number of annuitants involved, we find these studies credible.

7. During the trial, the court described plaintiff's position as follows:

The Court: Ms. Ross, if Wayne State University negotiates or purchases a plan offered by an insurance company to provide annuity benefits for retirement and that company uses reasonable actuarial considerations taken into account by underwriters and one of those considerations is the mortality rate for women and men separately, are you contending that Wayne State University violates Title VII by so negotiating that contract or purchasing that plan?"
Ms. Ross: That's right, your Honor."
Tr. at 1181.

From the beginning, defendants have contended that their plan, in which equal contributions are made by and for all employees, does not violate Title VII or 42 U.S.C. § 1985(3) simply because, when computing periodic payment rates for annuities, they consider the different mortality risks of men and women. Defendants argue that even if the universally accepted practice of using sex-based mortality tables violates Title VII, their use would be permissible as being "reasonably necessary to the normal operation" of a sound retirement plan; that recognizing differences in male and female mortality is necessary to equitably administer the individual contracts with male and female annuitants; that Title VII, by its terms, applies solely to the relationship between employees and employer and not the contractual relationships between employees and insurers; and that *Manhart* is inapplicable since the Court clearly held that neither its decision nor Title VII was meant to affect the insurance industry.[8]

In addition, TIAA/CREF justifies its use of sex-based tables by pointing out that although women receive smaller periodic benefits, their actuarial benefits are exactly the same.

We agree with the defendants that the defined contribution plan in this case provides equal actuarial benefits to both men and women, so that, on an actuarial basis, the plan does not discriminate against women. Mr. Ardan Gill[9] explained in great

detail the importance of risk classification in the annuity and insurance business. He testified that age and sex are the only risk classifications recognized as significant in annuities. Age is significant because older groups have a lower life expectancy than younger groups, so it would be unfair to pay them an annuity at the same rate. Similarly, women as a group live longer than men and, therefore, the contributions accumulated in their individual account must be distributed over a greater period of time. He testified that no insurance company can ignore age or sex in risk classification.[10] Mr. Gill explained that because women as a group live longer, use of separate life-expectancy tables for men and women is necessary to correctly predict the number of monthly payments required for each group of annuitants. This will assure that the total payment to each retiree is "actuarily equivalent," though the periodic payments to women are less. Mr. Gill concluded that:

[S]o long as you have the individual accounts which belong to the males and females, respectively, in my view there is no equitable way that you could equalize the income and give fair value for those accounts. Id. at 985.

A plan which pays female annuitants at the same periodic rate as men, without additional funds, would become insolvent while a large number of female annuitants are

---

8. Defendants also argue, as they did for summary judgment, that a Labor Department regulation, 29 C.F.R. § 800.116(d), allows either unequal contributions or unequal benefits in retirement plans. Although this regulation was not at issue in *Manhart*, the court commented that the Wage and Hour Administration issued several conflicting regulations, § 800.116(d) and § 800.151 which prohibits sex-based *wage* differentials. After quoting § 800.151 approvingly, the Court concluded:

[T]o the extent that they conflict we find that the reasoning of § 800.151 has more "power to persuade" than the *ipse dexit* of § 800.-116(d). *Cf. Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124.

9. Mr. Gill, whose testimony we fully credit, is an eminent authority in the field of actuarial science. He is a member of the Society of Actuaries and a past member of its Board of

Governors. He served on the Society of Actuaries Mortality Committee which studies annually the mortality experience of a number of insurance companies and which periodically issues mortality tables. He also served on the Societies' Advisory Committee on Education and Examination. He has personally developed mortality tables and has written many insurance and annuity contracts. He has served as an underwriter in classifying risks. He was a senior vice-president and chief actuary for Mutual Life Insurance of New York, with actuarial responsibility for pensions. *See*, Biographical Information, TIAA Exhibit # 34, Tr. 898–908.

10. Mr. Gill disagreed with plaintiffs' expert, Mr. Anderson, who testified that sex was less important than age in risk classification. Tr. at 922.

still alive.[11] Plaintiffs' evidence did not refute that the TIAA/CREF plan does not discriminate against women on an actuarial basis.[12] Thus, we find that the defendant's plan utilized proper actuarial considerations and men as a group and women as a group receive the same actuarial value for their money.

The plaintiffs have established without contradiction, however, that the TIAA/CREF program discriminates against individual women. There is no doubt that in a defined contribution plan an individual woman receives a smaller monthly check from TIAA/CREF than a similarly situated male, solely because she is a woman. It is obvious that all men and all women do not live to the age predicted for their sex by sex-segregated mortality tables. Consequently, assuming equal accumulations, every woman who dies at the same age as her male counterpart will receive less benefits both periodically and in total. Plaintiffs' actuarial expert testified that life expectancy is only a statistical average and that it is only in a group situation that one looks to the group as a whole to obtain an insurance rate.[13] Thus, the use of separate mortality tables is non-discriminatory as applied to men as a group and to women as a group, but is discriminatory as applied to an individual woman annuitant.

In *City of Los Angeles, Department of Water and Power v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), the Court, after acknowledging that women as a class live longer than men as a class, held that to comply with Title VII, employer pension plans must be nondiscriminatory on an individual basis, rather than on a class basis. The Court reasoned that all individuals of a class do not share the characteristics of the class as a whole and that Title VII prohibits treatment of individuals as a mere component of a class. The Court said:

> The statute makes it unlawful "to discriminate against an *individual* with respect to his compensation, terms, conditions or privileges of employment, because of such *individual's* race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The statute's focus on the individual is unambiguous. It precludes treatment of individuals as simply components of a racial, religious, sexual or national class. 438 U.S. at 708, 98 S.Ct. at 1375 (emphasis in original).

The application of *Manhart* to a defined contribution retirement plan requires that we resolve problems identical to those confronted by the First Circuit Court of Appeals in *Equal Employment Opportunity Commission v. Colby College*, 589 F.2d 1139 (1st Cir. 1978). The defendants argue that *Manhart* is distinguishable because WSU makes equal contributions on behalf of all its employees regardless of sex, and because *Manhart* did not involve an insurance company, separate from plaintiffs' employer.[14] The First Circuit Court of Appeals rejected these same contentions in *Equal Employment Opportunity Commis-*

---

11. Dr. William Greenough, Chairman of TIAA/CREF, a recognized expert on retirement plans, agrees with Mr. Gill that given the same accumulation, a plan which pays female annuitants at the male rate cannot remain fiscally sound. Tr. at 1145–46.

12. Plaintiffs called as a rebuttal witness Mr. Edwin Hustead, chief actuary for the Civil Service Commission. Although he testified that he believed that use of single sex mortality tables to structure annuity payments was feasible, he admitted that his was the minority view. Tr. 1346, 1357, 1410. It is apparent, however, that Mr. Hustead's opinion as to the appropriateness of "unisex" tables was based on his conception of public policy rather than his experience as an actuary. Tr. at 1406. Similarly, plaintiffs' finance expert, Dr. Gerald Martin,

admitted on cross-examination that a female's account would have a greater present value if she received the same periodic payment as a male. Tr. at 238–39.

13. Dr. Barbara Bergman, professor of economics, testified that individuals in annuity programs are placed into groups rather than into insurance risks, which does result in different treatment for those individuals. Plaintiffs, therefore, attempted to establish that many factors other than sex can predict mortality, such as health, blood pressure, obesity, environment, occupation, etc. Tr. 45–48, 1412–13.

14. *See* TIAA/CREF proposed conclusion of law, # 3; WSU proposed finding of fact # 34, # 37.

*sion v. Colby College, supra,* finding "the issues in this instant case highly comparable to *Manhart.*" 589 F.2d at 1144. It is apparent that the only difference between *Manhart* and this case is that *Manhart* involved a defined benefit plan rather than a defined contribution plan. We do not think this distinction is significant. In a retirement plan, either the contributions are varied to account for lower female mortality rate and the benefits are held constant, or the benefits are varied and the contributions are held constant. Thus, the rationale for a sex based differential is the same in either type of plan and the Court in *Manhart* nowhere limits its holding to defined benefit plans. We agree with the First Circuit that:

> If the statute's "focus on the individual" forbids an employer from treating women as a class with respect to annuities so as to require from them higher premiums, although they as a class receive more for their money, it is difficult to perceive a distinction that would permit a plan whereby women make contributions equal to those of men, but receive smaller monthly payments.

The defendants TIAA/CREF rely upon the following language in *Manhart*:

> [W]e do not suggest that the statute (Title VII) was intended to revolutionize the insurance and pension industries. . . . Nothing in our holding implies that it would be unlawful for an employer to set aside equal retirement contributions for each employee and let each retiree purchase the largest benefit which his or her accumulated contributions could command in the open market. 435 U.S. at 717–18, 98 S.Ct. at 138. (Footnote omitted).

This language, however, is inapplicable because WSU employees are not provided with an option to use their equal contributions at retirement to purchase the largest benefit they can on the open market.[15] They can only purchase from TIAA/CREF,

who utilize sex segregated mortality tables which discriminate against plaintiffs. We remain persuaded that *Manhart's* disapproval of the use of sex based longevity tables in a defined benefit plan extends to the defined contribution plan challenged here. We cannot accept WSU's argument that in making equal contributions they are acting independently of TIAA/CREF or TIAA's argument that they act solely as an insurer and not as an employer within the meaning of Title VII. The ties between WSU and TIAA/CREF are too great to allow them to each deny liability on account of the actions of the other. The sole reason for TIAA's existence is to service institutions of higher education and to do so by providing each employee with an individual contract which immediately vests and is totally portable.

■ In a post trial brief, TIAA/CREF suggests for the first time that we conclude as a matter of law that they are in the business of insurance, and, therefore, the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.* (the "Act") exempts them from the provisions of Title VII. Defendants argue that as insurers they are controlled by state insurance laws "[which permit] insurers to recognize differing risks in male/female mortality in computing annuity rates under contracts such as those issued by the TIAA/CREF." Defendants' proposed conclusions of law at 48. The Act was not considered by the Court in *Manhart* since an insurer was not involved. It was argued vigorously in *Spirt v. Teachers Insurance and Annuity Association,* 74 Civ. 1674 (S.D. N.Y.), 475 F.Supp. 1297, however, in which the court held that TIAA is in the business of insurance, that its operations are fully regulated by New York Insurance Law, and that the Act, therefore, exempts it from the provisions of Title VII. The court further held that the Act did not apply to CREF because, as a variable annuity company, it does not assume any "investment risk" and thus is not in the business of insurance.

---

**15.** In 1972, TIAA/CREF offered annuitants only a 10% cash option at retirement, contingent upon the approval of the institution from which the employee retired. This cash option

was not intended to permit the employee to purchase an outside annuity. It was intended to cover special transition needs. P.Exh. 29 at 1.

We cannot agree that TIAA's annuity business is the "business of insurance." We have already indicated that TIAA was incorporated as an educational service organization to administer a retirement system exclusively for employees of educational institutions, a system dependent upon cooperation and mutual contributions from the colleges and teachers. To assure a sound retirement system, a reserve is accumulated which will meet ultimate benefit payments. Employees are furnished with individual contracts which provide for immediate vesting and which are fully funded. The cost of the annuity contract was reduced by eliminating agents and premium schedules. In many participating institutions, the contribution or rate of payment is a mandatory subject of collective bargaining by law. The annuitants are entitled to receive the full value of the funds in their accounts through periodic payments or as a death benefit. Thus, as a service organization created to administer these annuity contracts, TIAA's relationship with its annuitants is not similar to the relationship existing between an insurance company and its policyholder. TIAA is so intertwined with the institutions it serves that it more resembles an employer rather than a company engaged in the "business of insurance." TIAA does not have an "investment risk" associated with the "business of insurance." The fact that TIAA uses sex-segregated mortality tables does not mean that it is "in the business of insurance" as defined in *S. E. C. v. National Securities, Inc.*, 393 U.S. 453, 459–60, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). It means only that no subsidization is required to equalize male and female periodic payments. *Cf. Group Life & Health Insurance Co. v. Royal Drug Co., Inc.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) (primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk).

Thus, we conclude that as to their Title VII count, plaintiffs are entitled to a declaratory judgment that the defined contribution plan furnished WSU employees, like the defined benefit plan in *Manhart*, violates Title VII. Plaintiffs are entitled as well to an injunctive order enjoining TIAA and WSU from continuing with the TIAA retirement plan. We find that defendants did not intentionally discriminate against women, but rather believed that their plan, which did provide equal actuarial benefits for both men and women, was in compliance with the laws.[16] Under that finding, we conclude that retroactive damages should not be awarded. *See Manhart*, 435 U.S. at 718–23, 98 S.Ct. 1370. This trial proceeded on the liability issue only and, thus, on the record before us, we are unable to determine whether any monetary award should be made against either or both defendants from the date *Manhart* was decided, April 25, 1978, to the present. We will, therefore, afford plaintiffs an opportunity to proceed with proofs of the damage issue, limited to that period.[17]

■ Finally, we find for defendants on plaintiffs' § 1985(3) count. In addition to failing to set forth in the complaint underlying factual allegations of a conspiracy, plaintiffs failed to produce credible evidence at trial of an "invidiously discriminatory animus" against women as a class. *See Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Plaintiffs must *allege* that there was a class based "invidiously discriminatory animus" behind the alleged discrimination. Moreover, it was incumbent upon plaintiffs to prove that TIAA/CREF and WSU, motivated by an invidiously discriminatory animus, discrimi-

---

16. Various governmental agencies had conflicting views on the compliance issue. The Equal Employment Opportunity Coordinating Council which had statutory responsibility to reconcile conflicting agency views (42 U.S.C. § 2000e–14) could not unanimously agree. *See* Memorandum Opinion, *Board of Governors WSU v. Perry*, No. 670039 (E.D.Mich., December 14, 1976), at 9, n.6.

17. Since only declaratory and injunctive relief is being awarded, we need not decide the defendants' claims against each other. We leave that for consideration when we resolve the damage issue.

nated against them because they were women and not because they belong to a class of persons with greater longevity. *See Ohio Inns, Inc. v. Nye*, 542 F.2d 673, 679 (6th Cir. 1976), *cert. denied* 430 U.S. 946, 97 S.Ct. 1583, 51 L.Ed.2d 794 (1977). Plaintiffs neither alleged nor produced any such evidence. The evidence produced establishes only that TIAA/CREF, in considering sex as a risk factor, followed standard actuarial practice.[18] It is abundantly clear to us that plaintiffs' § 1985(3) claim must be dismissed.

Judgment will be entered accordingly.

IT IS SO ORDERED.

---

18. *See,* Testimony of William Greenough, Chief Executive Officer of defendant TIAA/CREF, which we fully credit.