EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

The WOOSTER BRUSH COMPANY, et al., Defendants.

Civ. A. No. C80–1678A.

United States District Court,
N. D. Ohio, E. D.

Oct. 8, 1981.

Bruce B. Elfvin, Robert S. Bauders, Anne L. Meyers, EEOC, Cleveland District Office, Cleveland, Ohio, Leroy D. Clark, James N. Finney, EEOC, Washington, D. C., for plaintiff.

Ronald E. Holtman, Lincoln Oviatt, Wooster, Ohio, Evan Jay Cutting, Baker & Hostetler, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

Invoking the Court's jurisdiction under 28 U.S.C. §§ 451, 1343, and 1345, plaintiff Equal Employment Opportunity Commission (EEOC) initiated this action under section 706(f)(1) & (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–5(f)(1) & (3), for monetary and injunctive relief to redress alleged discrimination by defendants the Wooster Brush Company (Company) and the Wooster Brush Company Employees Relief Association (Association) against female employees because of their sex. The following, in accordance with Rule 52, Federal Rules of Civil Procedure, shall constitute the Court's findings of fact and conclusions of law as determined after a full trial on the merits, at which trial the Court duly heard testimony and received exhibits.

## I. FACTS

The Company is a manufacturer of paint brushes, rollers, sprayers, and other associated items. It is a corporation operated by a board of directors and officers. The Company employs both male and female employees, who, as employees, are entitled to certain company benefits as explained to them upon joining the Company and as listed in the employee handbook. One of the benefits listed in the employee handbook is the opportunity for membership in the Association.

Defendant Association is an unincorporated association formed for the purpose of providing disability benefits to its members who are unable to work because of illness. It is operated by its board of directors and officers. The Association members elect the board of directors to carry on the day-to-day functions of the Association, although as a practical matter, one of the Company employees who is also an Association member processes routine claims pending final approval by the board.

The Association was formed in 1935 at the initiative of Company employees. Before that time, it had been customary to "pass the hat" to collect money for a fellow employee whenever an employee became ill and was therefore unable to work. Upon proposing the Association, the employees elected a founding board of directors that in turn investigated and drafted a constitution. The Association constitution was adopted by Association membership and to date, with amendments, the constitution remains in effect.

Under the constitution, the Association is run by a five-member board of directors, each member having an equal vote. Four of the directors are elected from and by Association membership, and the fifth director is the Company secretary/treasurer or his designee.

From 1949 through 1959 Woodrow G. Zook had been elected to the board. In 1959 the Association membership amended the constitution to provide for the Company's secretary/treasurer or his designee to sit on the board. Zook, the secretary/treasurer in 1959, has retained his appointed seat on the Association board although his positions with the Company now include treasurer, president, chief executive officer, and member of the Company board of directors.

Association membership is voluntary. To become an Association member, one must 1) be an employee of the Company, 2) submit a recent physical examination report, 3) be approved for membership by a majority of the Association board of directors, and 4) pay monthly dues into the Association fund.

Association membership is available only to employees at the Wooster, Ohio; Elyria, Ohio; and Reno, Nevada plants. Employees of the Acme Brush Corporation, the Company's wholly-owned subsidiary, are ineligible to join the Association.

At the end of approximately two (2) months of employment, new employees are informed in a meeting with the person in charge of the Company's hourly personnel that they will become eligible for Company insurance benefits at the end of three (3) months. Employees are also informed at the same meeting that they may apply for membership in the Association.

The requirement that the prospective Association member must submit a physical examination report may be satisfied by submitting the report of the Company's pre-employment physical. If the employee chooses not to submit the report of the Company's physical, the applicant must obtain a physical at his or her own expense.

Once the physical examination report has been submitted, it and the employee's application are presented to the Association's secretary/treasurer for the board of directors' consideration at the next board meeting. Applicants must meet minimum health requirements, and approval of one's health for purposes of working for the Company will not trigger automatic acceptance into the Association.

Finally, to maintain membership in the Association, the member must pay monthly dues, presently set at the amount of Two Dollars, Fifty Cents ($2.50). The dues of hourly and non-exempt salaried workers are deducted from their Company payroll checks.[1] Exempt salaried workers pay their dues in annual payments.

In addition to receiving dues from its members, the Association receives funds from the Company. The Company regularly contributes to a variety of charitable organizations. Charities listed on the Company's income tax returns include the Association, the United Way, the YMCA, the College of Wooster, and Goodwill Industries. About thirty-nine percent (39%) of the Company's total charitable contribution budget is donated to the Association. In addition to monetary contributions for which the Company takes charitable deductions, the Company makes monetary contributions for which it takes no charitable deductions. Other contributions are made, in kind, to what the Company believes are worthy organizations such as parent/teacher organizations, Boy Scouts, and churches that request company products for use in their respective cleaning and refurbishing projects.

When the Association was first formed, the Company contributed twenty-five percent (25%) of the Association's operating budget. Currently, the Company contributes dollar-for-dollar the amount of dues paid by Association members. When the Association fund reaches Fifty Thousand Dollars ($50,000.00), a moratorium is placed on dues payments and, consequently, no funds are received from the Company. No additional dues are collected until payment of disability benefits utilizes money in the fund, thereby reducing the fund and again necessitating the payment of more dues.

The Association pays One Hundred Dollars ($100.00) a week for up to thirty-nine (39) weeks in any one year or for any one disability to male and female members who are disabled due to injury or illness. The Association does not, however, pay benefits on claims related to disability arising from pregnancy.

The EEOC brings this action upon a determination that there was reasonable cause to believe that charges of unlawful employment practices by the Company and the Association in violation of Title VII were true and that conciliation attempts by the EEOC had failed. The basis of the complaint is an allegation that the Company, directly and by and/or through its agent, the Association, unlawfully discriminates against women because of their sex by providing disability benefits for temporary disabilities other than pregnancy but by failing to provide pregnancy-related disability benefits.

## II. DISCUSSION AND CONCLUSIONS OF LAW

### A. Synopsis of Arguments

Under the relevant portion of 42 U.S.C. § 2000e–2(a)(1), "[i]t shall be an unlawful employment practice for an employer . . .

---

1. Non-exempt salaried workers are not exempt from coverage by wage/hour provisions as contained in sections 6 and 7 of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 206 & 207, and are therefore paid in overtime or compensatory time for hours worked beyond a forty-hour work week. Exempt salaried workers are not subject to the wage/hour laws and are paid a straight salary.

to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." For purposes of Title VII,

> [t]he terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work.

42 U.S.C. § 2000e(k).

 It is undisputed that the Company's female employees who are members of the Association do not receive pregnancy-related benefits. Moreover, under 42 U.S.C. §§ 2000e(k) and 2000e–2(a)(1), the failure of an employer to pay pregnancy-related disability benefits while paying benefits for disabilities that render one similarly unable to work constitutes unlawful discrimination. Therefore, if the Company and Association fall within the statutory definition of "employer", 42 U.S.C. § 2000e(b), defendants are liable for violation of Title VII.

Plaintiff asserts that the Company and the Association, as a single employer under subsection (b) of 42 U.S.C. § 2000e, are liable for violation of 42 U.S.C. § 2000e–2(a)(1). Plaintiff asserts in the alternative that both entities fall within subsection 2000e(b) by virtue of an agency relationship existing between the Company as principal and the Association as agent.

Defendant Company maintains that it does not discriminate against women in its employment practices. The Company observes that except for the EEOC's allegation of discrimination via the Association, the plaintiff alleges no other discrimination by the Company against its female employees. The Company relies on its belief that the facts support neither a finding that the Company and Association are joint employers nor a finding that an agency relationship exists between the Company and the Association. The conclusion reached by the Company is therefore that no discrimination can be established against it.

Defendant Association argues a threefold defense. First, the Association asserts that it is not an employer or agent within the meaning of 42 U.S.C. § 2000e(b); second, that assuming arguendo it is otherwise found to be an employer or agent, it is a bona fide private membership club exempt from taxation under section 501(c) of the Internal Revenue Code, and therefore not within the definition of employer in 42 U.S.C. § 2000e(b); and third, that assuming arguendo it is an employer not exempt as a private membership club, the Association is in the business of insurance, therefore the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 et seq., prevents construction of Title VII "to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b).

**B. Employer Status under Title VII**

Under the relevant portion of Title VII's definitions section, 42 U.S.C. § 2000e(b),

> [t]he term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include . . . a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26.

Plaintiff's case hinges on a finding by this Court that the Company and Association are integrally related and that the combination operates to discriminate against women. EEOC does not argue that the Company, without the Association, is discriminating against women. Women and men receive the same pay for doing the same work; women and men are entitled to the same unpaid leave of absence for disability, which includes pregnancy and pregnancy-related disability; women and men are equally eligible for group hospital, sur-

gical, and life insurance (and supplemental medicare insurance, conditioned upon the employee's eligibility). Moreover, EEOC does not argue that the Association was originally formed for the benefit of the Company or at the Company's direction.

Neither does EEOC argue that the Association, without the Company, may be liable under Title VII for discriminating against its female members. The Association has no employees, therefore does not, by itself, fall within the definition of "employer" under 42 U.S.C. § 2000e(b).

■ The critical issue in a determination of employer status of two entities under Title VII is whether one entity's activities are so closely related to the activities of the other that discrimination by one will be imputed to the other for purposes of liability for violations of Title VII. *See, e. g., Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973); *Puntolillo v. New Hampshire Racing Commission*, 375 F.Supp. 1089 (D.N.H.1974).

■ The Sixth Circuit Court of Appeals recognizes that "Title VII . . . should not be construed narrowly." *Tipler v. du Pont de Nemours & Co.*, 443 F.2d 125, 131 (6th Cir. 1971). Consistent with the Court of Appeals' implicit endorsement of liberal statutory construction of Title VII, the definition of "employer" is to be construed to effectuate the "remedial purpose of erradicating discrimination in employment." *Spirt v. Teachers Insurance and Annuity Assoc.*, 475 F.Supp. 1298, 1308 (S.D.N.Y.1979). *See also Silver v. Mohasco Corp.*, 602 F.2d 1083, 1087 (2d Cir. 1979); *Craig v. Department of Health, Education & Welfare*, 581 F.2d 189, 193 (8th Cir. 1978); *Bell v. Brown*, 557 F.2d 849, 853 (D.C. Cir. 1977).

The Title VII term "employer" "has been construed in a functional sense to encompass persons who are not employers in conventional terms, but who nevertheless control some aspect of an individual's compensation, terms, conditions, or privileges of employment." *Spirt v. Teachers Insurance and Annuity Assoc., supra.*

■ Courts that have been faced with determining whether two entities may be liable as an employer under Title VII have used two methods of analysis. One basis for liability rests on a finding that the two entities constitute a single or joint employer. *Baker v. Stuart Broadcasting Co.*, 560 F.2d 389 (8th Cir. 1977). A second, alternate basis is that one entity is merely the agent or instrumentality of the other. *EEOC v. ISC Financial Corp.*, 14 EPD ¶ 7729 (W.D.Mo.1977). *See generally, Linskey v. Heidleberg Eastern, Inc.*, 470 F.Supp. 1181, 1184 (E.D.N.Y.1979); *EEOC v. Upjohn Corp.*, 445 F.Supp. 635, 638 (N.D.Ga. 1977).

Under *Baker v. Stuart Broadcasting Co., supra* at 392,

the standard to be employed to determine whether consolidation of separate entities is proper are the standards promulgated by the National Labor Relations Board: (1) interrelation of operations[;] (2) common management[;] (3) centralized control of labor relations; and (4) common ownership or financial control. *Radio & Television Broadcast Technicians Local Union 1264, International Brotherhood of Electrical Workers, AFL–CIO v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965) . . . . In view of the liberal treatment accorded to Title VII, we conclude that these factors should be applied in the determination of "employer" under 42 U.S.C. § 2000e(b).

(Other citations omitted.) The court in *Baker* adopted the four-part standard to determine the single-employer status of two companies. But this Court finds that the standard is also helpful by analogy in the context of the instant action involving a company and a benefits association. The Court will therefore apply the *Baker* standard to aid in determining whether the Association controls an aspect of Company employees' compensation, terms, conditions, or privileges of employment, and whether the nexus between the Company and the Association renders them liable for the Association's failure to pay benefits for disabilities related to pregnancy.

■ Applying the standard set out in *Baker v. Stuart Broadcasting Co., supra*,[2] the Court considers, first, the extent of interrelation of Company and Association operations. The following facts are significant to the Court's determination: recently-hired employees of the Company receive information about the opportunity for Association membership from a Company personnel officer who also informs the employees of other benefits as listed in the employee handbook; application forms for admission and other Association information are distributed through internal Company communication channels; Association dues of hourly and non-exempt salaried workers are deducted from their Company payroll checks; Association volunteers do their Association work on Company time, using Company equipment, office space, and storage space; ballots for electing Association board members are distributed through Company supervisors to the Association member/Company employees working under the respective supervisors. Upon these factors, the Court concludes that the Association's operations are interrelated with the operations of the Company.

The next issue is whether the Association and the Company share common management. Although the Company and the Association are run by separate boards, one man, Zook, serves as the Company treasurer, president, chief executive officer, and member of the Company board of directors and is also the only appointed member of the Association board of directors, where he serves as the secretary/treasurer. Trial testimony indicates that for non-routine disability claims, Zook is the Association board member who is contacted for a temporary determination of what to do with a claim until the Association board meets to decide whether to grant the claim. The Court concludes that Zook holds unique positions of power with both the Company and the Association. Whether he wields that power, or, if so, whether he wields it in a beneficent or maleficent manner, is irrelevant to the Court's finding that Zook holds important and influential management positions with both entities. The second test, common management, is therefore met.

The third test, centralized control of labor relations, is likewise met in this case. The employees of the Company are not unionized, therefore neither the Company nor the Association deals with labor unions. Moreover, the Association does not, by itself, have employees, therefore the Association does not, by itself, have control of labor relations. As Association business is handled by Association member "volunteers" on Company time and on Company premises, however, any labor dispute involving a Company employee acting for the Association would have to be handled by the Company. Thus, labor relations involving both the Company and the Association are controlled by the Company.

The final test under the *Baker* standard is whether the two entities share common or financial control. The Company has never overtly directed the Association to take any action. Nor has the Company ever threatened to decrease its financial contributions to the Association. The fact remains, however, that the Company contributes fifty percent (50%) of the Association's financial budget. As the Association's major contributor, the Company controls Association income. Moreover, Zook's control

**2.** The standard articulated in *Baker* is not inconsistent with the holding by the Sixth Circuit Court of Appeals in *Hassell v. Harmon Foods, Inc.*, 454 F.2d 199 (6th Cir. 1972). In *Hassell* the Court affirmed the district court's finding that a parent corporation and its wholly-owned subsidiary did not have "requisite 'substantial identity' such that they constitute a single employer as defined in 42 U.S.C. § 2000e(b)." *Id.*, at 199. The Court of Appeals held that evidence in the record supported the district court's observations that the affairs of the parent and subsidiary were " 'generally handled separately,' and that the subsidiary corporation was in legal contemplation a separate one." *Id.*, at 200. This Court agrees with the suggestion by another district court in this Circuit that "the *Baker* line of authority can be viewed, not as departing from the reasoning of *Hassell*, but as enunciating a test which is consistent with, but simply more detailed than, that used in *Hassell*." *Armbruster v. Quinn*, 498 F.Supp. 858, 862 (E.D.Mich.1980).

over temporary disposition of non-routine claims and his role as the only appointed Association board member combine to give the Company added control over other Association finances.

That the Company makes charitable contributions to organizations in addition to the Association is of no consequence to the Company's relationship with the Association. The Company's contributions to the Association are unique to the relationship between the two entities. Whereas the Company is one of many contributors to other charities, the Company is the Association's single most important contributor, responsible for half of the Association's income.

In addition, the benefit that the Company reaps from contributing to other charities is a general gain that results from giving financial and other support to organizations that the donor believes will produce a better society. The advantage obtained by contributing to the Association is more direct in that the Company is able to hold out Association membership as one of the benefits of working for the Company.

Employees automatically acquire "Company benefits" such as disability leave and group hospital, surgical, and life insurance. Company employees acquire "Association benefits" in the form of disability benefits only by becoming members of the Association and by contributing to the fund through payment of membership dues. Nonetheless, the only method by which a Company employee can obtain benefit of funds that the Company pays toward disability benefits is to join the Association. Thus, for purposes of determining whether a company and the provider of a benefit to company employees together constitute an employer under Title VII, the Court perceives little difference between funds that were established by employers and, as in the instant case, a fund that was originally established by company employees. *Cf. Peters v. Wayne State University*, 476 F.Supp.

1343 (E.D.Mich.1979) (employer university required by statute to provide pension benefits). Likewise, the Court perceives little difference between compulsory employee contributions to a fund and, as in the instant case, voluntary contributions to a fund. *Cf. Spirt v. Teachers Insurance & Annuity Assoc., supra* (university employees required to participate in retirement and annuity plan).[3]

Disability benefits are part of an individual's compensation for work performed for an employer. *See General Electric Co. v. Gilbert*, 429 U.S. 125, 128, 97 S.Ct. 401, 404, 50 L.Ed.2d 343 (1976). Under the circumstances of this case the Association's control of disability payments is control of an aspect of compensation to individuals who work for the Company. Therefore, the Association and the Company fall within the definition of "employer" under Title VII.

#### C. Title VII Bona Fide Private Membership Club

■ The term "employer" under Title VII "does not include . . . a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26." 42 U.S.C. § 2000e(b). To be exempt from Title VII coverage under the "bona fide private membership club" exception, the club must be tax exempt and must be a private membership club. Tax exempt status alone under the Internal Revenue Code is insufficient to bring an organization within the Title VII exception. *See Quijano v. University Federal Credit Union*, 617 F.2d 129, 131 n.12 (5th Cir. 1980). *See also Tillman v. Wheaton-Haven Recreation Ass'n.*, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973) (Title II); *Wright v. Cork Club*, 315 F.Supp. 1143 (S.D.Tex.1970) (Title II).

The Association's tax exempt status under 26 U.S.C. § 501(c)(9) is undisputed. The Court must therefore determine whether the Association is a private membership club under Title VII.

---

**3.** In each case, i. e., *Peters* and *Spirt*, the university and the provider of benefits were liable as a single employer under Title VII for unlaw-

ful discrimination against women because of sex.

■ The First Circuit Court of Appeals has articulated four criteria that must be met in order for an organization to achieve private membership club status. First, the organization must be a club, i. e., an association of persons for social or recreational purposes or for promotion of a common literary, scientific, or political objective. Second, the organization's objective must be legitimate and not a sham. Third, the organization must be private, not public. Fourth, the organization must require meaningful conditions of limited membership. *Quijano v. University Federal Credit Union, supra* at 131.

The Association was not created for social or recreational purposes or for promoting common literary, scientific, or political objectives. The sole reason for the Association's existence is to provide disability benefits for individuals who are members, i. e., for individuals who contribute to the Association and work for the Company. There is no evidence in the record that the members commingle in their capacity as Association members and with a common purpose.

No one faults the origins of the Association as an organization originally established to aid fellow employees. Moreover, the Court finds that providing disability benefits is a legitimate reason for the Association's existence. The Court therefore declines to find that the Association is a sham for analysis of the Association's status as a bona fide private membership club under Title VII.

The Court views the third and fourth criteria set out in *Quijano* as being closely related. While members of the general public are not admitted to the Association, neither does the Association impose meaningful conditions of limited membership. Access is premised, first of all, on being employed by the Company. Then, if a member meets the physical requirement and pays monthly dues, he or she can become and remain a member. As stated earlier, there is no common social, recreational, literary, scientific, or political requisite for Association membership. The binding objective of Association membership is personal benefit in case of disability while employed at the Company.

■ The Court accordingly concludes that the Association is not a bona fide private membership club as intended under Title VII. *See Chattanooga Automobile Club v. Commissioner of Internal Revenue*, 182 F.2d 551, 554 (6th Cir. 1950) (denying tax exempt status to automobile clubs). The Association's contention, then, that it is excluded from Title VII coverage because of status as a private membership club, is rejected.

### D. The McCarran-Ferguson Act

The McCarran-Ferguson Act provides in pertinent part:

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several states which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance.

15 U.S.C. § 1012.

■ Congress passed the McCarran-Ferguson Act soon after the United States Supreme Court held in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), "that insurance transactions were subject to federal regulations under the Commerce Clause, and that the antitrust laws ... were applicable to them." *S.E.C. v. National Securities, Inc.*, 393 U.S. 453, 458, 89 S.Ct. 564, 567, 21 L.Ed.2d 668 (1969). Before the decision in *South-Eastern Underwriters Ass'n*, both "Congress and the courts had assumed that the insurance business did not constitute interstate commerce and therefore that state taxation (regulation) of insurance companies doing business within the state's boundaries did not burden interstate commerce. *Paul v. Virginia*, 8 Wall. 168, 183, 19 L.Ed. 357 (1869)." *Women in*

*City Government United v. New York*, 515 F.Supp. 295, 302 n.27 (S.D.N.Y.1981).

The Supreme Court interprets that

[t]here is no question that the *primary* purpose of the McCarran-Ferguson Act was to preserve state regulations of the activities of insurance companies, as it existed before the South-Eastern Underwriters case.... The McCarran-Ferguson Act operates to assure that the States are free to regulate and tax insurance companies without fear of Commerce Clause attack.

*Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 218 n. 18, 99 S.Ct. 1067, 1077 n.18, 59 L.Ed.2d 261 (1979) (emphasis in original). The legislative history and the statutory language of the McCarran-Ferguson Act, coupled with the Supreme Court's statement of the primary purpose of the Act, lead to the conclusion that the act

should not be applied indiscriminately to subsequent federal legislation, the overriding purpose of which is not the regulation of commerce but the protection of other important federal interests, solely because that legislation fails specifically to state that it is applicable in circumstances where insurance interests are implicated.[30]

---

[30] Cf. *Ben v. General Motors Acceptance Corp.*, 374 F.Supp. 1199, 1203 (D.Colo.1974) ("There is no indication in the background and history of the McCarran Act or its application that the McCarran Act was intended to deprive a citizen of access to the Federal Courts to obtain redress for violations of his civil rights." 42 U.S.C. §§ 1982, 1985.). This view is strengthened in the context of Title VII due to the section of the Act preempting all state law in conflict with its anti-discrimination provisions. 42 U.S.C. § 2000e–7.

*Women in City Government United v. New York, supra* at 303.

This Court finds the reasoning utilized in the above-mentioned case to be persuasive, and endorses the conclusion reached therein. Dicta in *Hamilton Life Insurance Co. v. Republic National Life Insurance Co.*, 408 F.2d 606, 611 (2d Cir. 1969) indicates that "[t]he McCarran Act does not ... exempt the business of insurance from the coverage of all federal statutes which do not specifically state that their provisions are applicable to insurance." Congress' failure to expressly state that Title VII applies to the business of insurance "should not automatically shield that industry from the Act's prohibitions against racial, religious, alienage or sexual discrimination." *Women in City Government United v. New York, supra.*

Courts have not been unanimous in reaching the conclusion that the McCarran-Ferguson Act is inapplicable to Title VII. In an earlier case, which, like *Women in City Government United v. New York*, arose in federal district court for the southern district of New York, the court deemed federal legislation to relate to the business of insurance only if the legislation subsequent to passage of the McCarran-Ferguson Act expressly so indicates. The court in *Spirt v. Teachers Insurance & Annuity Ass'n, supra*, finding that Title VII is a law of general applicability with no specific reference to insurance, concluded that Title VII cannot override state legislation concerning the business of insurance. *Id.* at 1301.

Assuming arguendo this Court had adopted the approach taken in *Spirt*, the ultimate conclusion remains that the McCarran-Ferguson Act does not preclude the application of Title VII to the Association in this matter. For the McCarran-Ferguson Act to prevent Title VII application, the Association would have to be in the "business of insurance." Assuming further that such status as insurer were established, the state of Ohio would have had to regulate the activities in which the Association partakes, and the regulation would have to have been invalidated, impaired, or superseded by application of Title VII. *Spirt v. Teachers Insurance and Annuity Ass'n, supra.*

This Court finds that neither the Association nor the Company/Association combination is in the business of insurance within the meaning of the McCarran-Ferguson

Act.[4] The court in *Spirt* found that the Teachers Insurance and Annuity Association is subject to investment risks, therefore its activity can validly be termed "insurance." A district court within this circuit reached the opposite conclusion with respect to the same organization. In *Peters v. Wayne State University, supra* at 1351, the court stated:

> We cannot agree [with *Spirt*] that TIAA's annuity business is the "business of insurance." We have already indicated that TIAA was incorporated as an educational service organization to administer a retirement system exclusively for employees of educational institutions, a system dependent upon cooperation and mutual contributions from the colleges and teachers. To assure a sound retirement system, a reserve is accumulated which will meet ultimate benefit payments. Employees are furnished with individual contracts which provide for immediate vesting and which are fully funded. The cost of the annuity contract was reduced by eliminating agents and premium schedules. In many participating institutions, the contribution or rate of payment is a mandatory subject of collective bargaining by law. The annuitants are entitled to receive the full value of the funds in their accounts through periodic payments or as a death benefit. Thus, as a service organization created to administer these annuity contracts, TIAA's relationship with its annuitants is not similar to the relationship existing between an insurance company and its policyholder. TIAA is so intertwined with the institutions it serves that it more resembles an employer rather than a company engaged in the "business of insurance." TIAA does not have an "investment risk" associated with the "business of insurance".

In the case at bar, similar statements may be made concerning the Association. The Association was organized to provide and administer disability benefits exclusively for employees of the Company, and efficient operation of the Association depends on cooperation and mutual contributions from the Company and Association members. To assure a sound benefits system, a reserve is accumulated which will meet ultimate benefit payments, and when the reserve remains substantial enough to constitute a comfortable fund from which to make payments, contributions temporarily cease. Employees who choose to become Association members are issued no policies, nor do they receive individual contracts, but once they become members, they are entitled to full Association benefits. The Association has no insurance agents or premiums, per se. Although payment of dues is not subject to any collective bargaining agreement, contributions to the Association in the dues are uniform, and unless the Association membership elects to raise or lower dues and benefits, the individual members have no control over the amount of benefits they receive. The Association more closely resembles a service organization as described in *Peters Wayne State University* than an insurance company. As the Association investment risks are limited by Association restrictions to minimum-risk investments, the Association does not have an "investment risk" associated with the "business of insurance." It is funded solely by its members and the Company, and it has no monetary outlay other than the payment of benefits. The Court has already determined that the Association "is so intertwined with the institution it serves that it more closely resembles an employer rather than a company engaged in the "business of insurance." *Id.*

If the Court were to endorse the Association's argument that it is in the business of insurance, the Court would be giving its imprimatur to a system whereby any company could set up a disability fund for its employees and thereby avoid the reach of Title VII. In *Los Angeles Department of Water & Power v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), the Supreme Court hints that such an attempt by an employer to avoid responsibility to

---

**4.** It is undisputed that the Association is not an insurance company.

employees would be viewed with disfavor. The Court observes, "Title VII . . . primarily govern[s] relations between employees and their employer, not between employees and third parties. We do not suggest, of course, that an employer can avoid his responsibilities by delegating discriminatory programs to corporate shells." *Id.* at 718 n. 33, 98 S.Ct. at 1380 n.33.

 In the case at bar, there exists a further reason for determining that the McCarran-Ferguson Act does not prevent application of Title VII to the Association. Assuming arguendo the Association is in the business of insurance, violation of the McCarran-Ferguson Act occurs in this case only if Title VII is construed to invalidate, impair, or supersede any law enacted by [Ohio] for the purpose of regulating the business of insurance." 15 U.S.C. § 1012. Although Ohio has chosen to regulate the field of insurance as it concerns mutual protective insurance upon persons, Ohio Rev.Code Chap. 3919 (Page), and fraternal benefit societies, O.R.C. Chap. 3921, the state legislature has expressly exempted fraternal benefit societies like the Association from state insurance regulation. O.R.C. § 3919.09 [5]; O.R.C. § 3921.42(B).[6]

Therefore, no state insurance statute is invalidated, impaired, or superseded by the application of Title VII federal legislation to the activities of the Association.[7] *See Women in City Government United v. New York, supra* at 304; *Hamilton Life Insurance Co. v. Republic National Life Insurance Co., supra* at 611.

To recapitulate, the Court finds that the McCarran-Ferguson Act is inapplicable to Title VII. In the alternative, the Court finds that the Association is not in the business of insurance, or, if it is, no Ohio insurance regulations are invalidated, impaired, or superseded by application of Title VII.

### E. Remedy

 Plaintiff brought this action for monetary and injunctive relief. Monetary relief is sought on behalf of twenty-five (25) women who have taken pregnancy or pregnancy-related disability leaves since April 29, 1979. The parties have stipulated that if either or both defendants are found to be liable in this action, the twenty-five (25) women listed at trial will receive monetary compensation at One Hundred Dollars ($100.00) per week, excluding the first week

---

**5.** Section 3919.09 of the Ohio Revised Code exempts nonprofit fraternal benefit societies from portions of the chapter, e. g., from regulations concerning minimum reserves, O.R.C. § 3919.02, contract provisions for additional contributions, O.R.C. § 3919.03, reserves, O.R.C. § 3919.04, distribution tables, O.R.C. § 3919.05, contract provisions for disability benefits, O.R.C. § 3919.06, limits on cash surrender and loan values, O.R.C. § 3919.07, reports, O.R.C. § 3919.08, and foreign company or association business within Ohio. Upon careful review of the remainder of chapter 3919, the Court finds no other provisions that would be affected by application of Title VII.

**6.** Section 3921.42 of the Ohio Revised Code states in pertinent part:

Nothing contained in Chapter 3921 of the Revised Code affects or applies to:

. . . . .

(B) Orders, societies, or associations which admit to membership only persons engaged in one or more crafts or hazardous occupations, in the same or similar lines of business, insuring only their own members, their families and descendants of members, and the

ladies' societies or ladies' auxiliaries to such orders, societies, or associations.

**7.** The Court's acknowledgment of the Association as a fraternal benefit society under Ohio insurance law does not conflict with the Court's finding that the Association is not a private membership club under Title VII. Each statute defines terms to promote clarity within and understanding of the statute. That similar terms and phrases may be subject to differing interpretations under separate statutes comes as no surprise when one considers the various purposes and policies of legislation. The Ohio definition in O.R.C. § 3921.01 of "fraternal benefit society" is to be construed literally, consistent with the purpose of Ohio insurance laws that "have created and regulated the [fraternal benefit] society and the rights and obligations of its members." *United Commercial Travelers v. Wolfe,* 331 U.S. 586, 592, 67 S.Ct. 1355, 1358, 91 L.Ed. 1687 (1947). In contrast, Title VII is to be construed liberally, *Tipler v. duPont de Nemours, supra,* to meet the objective of federal civil rights litigation to eliminate discrimination on the basis of race, religion, alienage, or gender. See *Baker v. Stuart Broadcasting Co., supra* at 391.

of disability, for up to thirty-nine (39) weeks of actual disability as certified by a physician. As the Court determines that the plaintiff prevails in this action, each of the women identified shall receive a basic award calculated by the previously-agreed schedule, plus interest computed at the adjusted prime interest rate utilized by the Internal Revenue Service. *See EEOC v. Pacific Press Publishing Ass'n*, 482 F.Supp. 1291, 1319 (N.D.Cal.1979).

The Association's argument against its liability for retrospective monetary relief for pregnancy and pregnancy-related disability benefits is unsupported by legal authority. The Court accordingly declines to find that the Company is solely liable for Title VII violations. Instead, as both the Company and the Association fall within the Title VII definition of "employer," the entities will be held to joint liability. *Cf. Hairston v. McLean Trucking Co.*, 62 F.R.D. 642, 662 (M.D.N.C.1972) (joint liability permissible where principal/agent relationship exists), *vacated on other grounds*, 520 F.2d 226 (4th Cir. 1975).

The Association further argues that plaintiff should not be awarded prospective relief for the reason that "the relationship which underlies any finding could be altered to change those elements which the EEOC has argued created the liability." Defendant Association's Trial Brief at 2. Both the United States House of Representatives and the Senate, addressing the broad remedial scope accorded to the courts, have observed that a finding of discrimination against women within the context of Title VII would ordinarily mean that the employer would be required to pay more to those women who were discriminated against, rather than pay less to other employees. H.R.Rep.No.948, 95th Cong., 2d Sess. 9, *reprinted in* [1978] U.S.Code Cong. & Ad. News 4749, 4759; S.Rep.No.331, 95th Cong., 1st Sess. 8 (1977). By analogy, the Court will require that the Company employees who are Association members will continue to receive the present level of benefits for disabilities, including disabilities related to pregnancy. The Company and the Association, a single employer under Title VII, will not be permitted to reduce the amount of weekly benefits or the period for which disability benefits may be awarded.

Accordingly, the Court hereby finds for the plaintiff and against the defendants. Further, the women ascertained to have been denied pregnancy or pregnancy-related disability benefits since April 29, 1979 are hereby awarded the benefits they would have received if they had not been discriminated against, plus interest at the appropriate adjusted prime interest rate. Further, defendants are hereby permanently enjoined from discriminating against women on the basis of their gender. Further, defendants are hereby enjoined from reducing the amount of weekly disability benefits and/or the period for which disability benefits may be awarded.

IT IS SO ORDERED.